**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAVON JOHNSON,** | ) | |
| | ) | **No. 11 CV 6668** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | **November 29, 2012** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION and ORDER**

Javon Johnson applied for Supplemental Security Income ("SSI") in 2006 alleging

disability because of mental retardation and anxiety-related disorders. His application was

denied by the Social Security Administration and again by an administrative law judge

("ALJ"). Johnson challenges the ALJ's decision in the current motion for summary

judgment. For the following reasons, Johnson's motion is granted insofar as it requests a

remand:

**Procedural History**

Johnson applied for SSI on May 25, 2006, alleging disability beginning on January

1, 2006. (Administrative Record ("A.R.") 80-82, 164.) His claims were denied initially and

on reconsideration. (Id. at 86, 88-91.) Following a hearing in May 2009, the presiding ALJ

found Johnson to have two severe impairments—borderline intellectual functioning and

depressive mood disorder with psychotic features—but found that he is capable of working

if he complied with his treating psychiatrist's medical prescriptions. (Id. at 16-25.) When

the Appeals Council denied Johnson's request for review (id. at 1-6), the ALJ's decision

became the final decision of the Commissioner, *see Schmidt v. Astrue*, 496 F.3d 833, 841

(7th Cir. 2007). Johnson then filed the current suit seeking judicial review of the ALJ's

decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this

court. *See* 28 U.S.C. § 636(c). (R. 7.)

## Facts

Johnson, who was 31 years of age at the time of the hearing, had lived with his mother

his entire life but for about five years he spent in prison. (A.R. 32, 52, 54-55, 182.) As a

child, he attended regular education classes and completed the eighth grade, but dropped out

of school the following year. (Id. at 136, 255-57, 527.) He worked for a few days in 1997

and again in 1999, both times in fast food restaurants. (Id. at 142, 170.) His employment

ended when he walked off the job or was terminated. (Id. at 169, 187.)

## A. Medical Evidence

Johnson's medical record reaches back to 1992 when the state disability agency

requested that a licensed psychologist examine him in conjunction with an earlier application

for disability benefits. (A.R. 257-59.) The psychologist noted that Johnson was enrolled in

regular classes and described him as "somewhat lethargic with poor motivation." (Id. at

258.) After performing tests, the psychologist opined that Johnson's Full Scale I.Q. was

40—within the category of "Moderately Mentally Retarded"—and that his performance in

a picture vocabulary test was equivalent to that of a three-year old child. (Id.) She noted that

she considered the test results to be valid. (Id.) A different psychologist evaluated Johnson

2

seven years later in 1999 and opined that his Full Scale I.Q. was 45. (Id. at 260-64.) That psychologist however commented that the "[t]est scores are invalid" because those scores "were depressed by general lethargy, frequent carelessness and low frustration tolerance." (Id. at 264.) The psychologist also commented that Johnson's "[r]esponses were coherent, blunt, usually 1 or 2 words at a time, preceded by pauses." (Id. at 262.)

Johnson's medical file also includes numerous records from his time at the Gilmer and Butner federal corrections institutions, which are summarized here because the medical experts refer to them and because they provide some indicia of his ability to communicate. Johnson appears to have written his own inmate request forms in January and April 2006, stating that "I've been having dizzy spells lately. (a [sic] lot.)" and "I've symptoms and need a refill on my Acyclovir medication for an infection." (Id. at 336, 342.) He also cogently communicated that he is a smoker "mainly when I have to use the washroom." (Id. at 405.) On another form, he appears to have written that he "was shot in [the] mouth and was suppose [sic] to have [the] [b]ullet removed . . . Dr. Mornof in Chicago, IL . . . was suppose [sic] to remove [the] bullet." (Id. at 417.) At various intake screenings, the medical staff evaluated Johnson as presenting without disabilities (id. at 419, 420, 421), and a registered nurse also indicated that he was without any "barriers to education" (id. at 345). He appears to have also signed his name on various forms. (Id. at 342, 413, 415, 417, 428.) He was approved for work duty by two examiners. (Id. at 403, 421.) And, he requested a referral to the optometrist because he claimed to have experienced headaches while reading. (Id. at 422.) Though Johnson repeatedly denied mental health problems in his intake forms (id. at

409, 412), his medical records from prison also indicate that he was on a suicide watch because of suicidal ideations in September 2005. (Id. at 355.)

In October 2006, after Johnson was released from prison, he was evaluated by Alan Long, Ph.D., at the request of the state disability agency. (Id. at 265-68.) Dr. Long noted that Johnson refused to perform the examination tasks, was actively hallucinating during the examination, and was visually scanning his environment. (Id. at 266.) Dr. Long opined that Johnson's full scale I.Q. was 45 and that Johnson suffers from mental retardation, though the severity was unspecified due to Johnson's lack of cooperation during testing. (Id. at 266-67.) The following month the state agency reviewing psychologist, Kirk Boyenga, Ph.D., reviewed Dr. Long's assessment and determined that the test results were invalid because of Johnson's lack of effort. (Id. at 268-80.) Dr. Boyenga noted that the low I.Q. score conflicted with Johnson's reports of his activities of daily living, his criminal conviction on gun charges, and his time served in prison. (Id. at 280).

The following year, in April 2007, Johnson was admitted through the emergency room at St. Bernard Health Center because he was pacing at home, "easily agitated, hallucinating, isolative and withdrawn, fearful" and non-compliant with his medication. (Id. at 282.) Johnson's condition improved with medication and therapy and he was discharged after four days in the hospital. (Id.) His GAF score was noted as 28.[1] (Id.) The hospital's discharge

---

[1] A Global Assessment of Functioning, or GAF, score is used to measure an individual's overall functional capacity. A GAF score in the range of 21 to 30 indicates behavior that is "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas." *Diagnostic and*

summary report and psychiatric assessment reports noted that Johnson exhibited impaired judgment and demonstrated average I.Q., but was suffering from suicidal and homicidal ideations. (Id. at 282-83.) Following this inpatient stay, the state disability agency requested that Russell Taylor, Ph.D., conduct a mental residual functional capacity ("RFC") assessment of Johnson. (Id. at 290-92.) Dr. Taylor opined that "[m]ental status data indicates he is not mentally retarded as alleged but is oriented with intact memory and thought processes. . . . [Claimant] is capable of understanding, remembering and carrying out simple tasks. He is able to interact with others and could adjust to routine changes in the work setting." (Id. at 292.) Dr. Taylor based his evaluation on Johnson's prison records, which he opined "do not establish mental retardation or mental problems," the I.Q. tests, whose validity he questioned because of Johnson's lack of efforts, the hospital's psychiatric assessment, which characterized Johnson's I.Q. as average, and Johnson's activities of daily living, which included driving, leaving home alone, cooking, cleaning, shopping, and some socializing. (Id. at 306.)

The record shows that Johnson sought mental health treatment at Roseland Health Center starting in August 2007. (Id. at 315.) Dr. John Jones, a psychiatrist, prescribed Zoloft and Seroquel and provided samples to him about every eight weeks from August 2007 until December 2007 and every four weeks thereafter through July 2008. (Id. at 316-17.) Dr. Jones's treatment notes from February 2008 through June 2008 indicate that Johnson

---

*Statistical Manual of Mental Disorders,* 32-34 (4th ed. 2000).

believed that he was being watched and was hearing voices, but that he was compliant with his medications and that his overall status was stable. (Id. at 318-21.) Dr. Jones noted that Johnson's speech, affect, behavior, and memory were within normal limits. (Id. at 318-19.)

In April 2008, about eight months after Dr. Jones started treating Johnson, he completed a formal medical evaluation of Johnson. (Id. at 308-12.) He indicated that Johnson's chief complaints were auditory hallucinations, paranoia, and depression. (Id. at 309.) He summarized Johnson's mental status as "alert, disoriented to time, auditory hallucinations, paranoia," with poor response to medication and therapy. (Id. at 312.) He opined that Johnson exhibited extreme limitations in his ability to perform activities of daily living and in his social functioning and a marked limitation in concentration, persistence, and pace. (Id.)

In conjunction with Dr. Jones's care, Johnson received therapy from Valerie Beavers. Her treatment notes from July 2008 state that Johnson's GAF score was 57,[2] that he was oriented and denied having problems, but complained of having bad days, meaning "I don't have money to buy things." (Id. at 441.) Two weeks later, Beavers noted that Johnson admitted to sporadic medication compliance because of his failure to remember to take the medication. (Id. at 448.) Johnson told Beavers that "I haven't been right since I got home. I use [sic] to enjoy being with friend [sic] and hanging out[.] [N]ow I just sit at home and

---

[2] A GAF score in the range of 51 to 60 indicates "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning." *Diagnostic and Statistical Manual of Mental Disorders*, 32-34 (4th ed. 2000).

watch TV." (Id.) He explained that he would not work because "I couldn't take nobody telling me when to come and go." (Id.) In September 2008, Johnson missed an appointment with Beavers. (Id. at 454.) When Johnson appeared for another appointment later that month, he admitted to inconsistent medication compliance and asked his therapist about "getting my own place." (Id. at 437.) Beavers's notes indicate that Johnson's compliance with scheduled appointments and with his treatment plan was partial. (Id.) Dr. Jones's treatment notes from around the same time however indicate that Johnson was compliant with medication, but that his auditory hallucinations and paranoia persisted. (Id. at 450.)

A few months later, in November 2008, Johnson met with Dr. Jones and Beavers again. Dr. Jones described Johnson as having a cooperative attitude with normal speech and volume. (Id. at 435.) He noted that Johnson complained of being fearful to leave home because he believed that people were after him. (Id.) He was depressed but stable and denied adverse effects of medications. (Id.) In Beavers's summary of her appointment with Johnson, she wrote that Johnson reported that since he had returned from prison, he had been experiencing increased anxiety when exposed to "tall buildings, elevators, crowds, and bridges." (Id. at 432.) The following month, another therapist, Vicki Todd, commented that Johnson complained of being afraid to attend his hearing before the ALJ because it would be in Chicago, and he feared terrorism in President Obama's hometown. (Id. at 518.) Beavers entered a treatment note that month indicating that Johnson's mother claimed to watch him take his medication, but that she believed that the medication was not working because he is easily agitated, isolated, and pacing in their home. (Id. at 516.)

7

Johnson returned to Beavers three times in January 2009. On January 20, 2009, Johnson admitted that he had been out of his medication for some time and complained of feeling anxious in crowds. (Id. at 512.) The next day, Johnson confirmed his sporadic compliance with medication and stated that his primary symptom was feeling anxious and fearful, especially in crowds. (Id. at 514.) He expressed concern about his ability to work. (Id.) Beavers summarized that "[t]here was no evidence of mood and / or thought disorder. Insight and judgement [sic] fair." (Id.) Johnson returned the following day, and again Beavers noted no evidence of mood or thought disorder, with fair insight and judgment. (Id. at 510.) She reported that Johnson had biked to his appointment. (Id.) He mentioned that he felt paranoid, "like somebody is going to do something to me," but did not always take his medication because "the medication really doesn't help me." (Id.) During a March 2009 appointment with Beavers, Johnson stated that his problem is that he has no income. (Id. at 507-08.)

In April 2009, Johnson's representative asked Winston Hall, a certified psychologist, and Terrence Hines, a licensed clinical psychologist, to evaluate Johnson's intellectual and academic functioning. (Id. at 463-69.) The examiners observed that Johnson was "disoriented, anxiety ridden, and oppositional . . . and out of touch with what was going on." (Id. at 465.) During the examination, Johnson held a hair dryer and turned it on and off, sometimes aiming it at one of the psychologists. (Id. at 464.) Because Johnson failed to communicate with the psychologists, his mother instead related his limited daily activities, history of special education, and life history. (Id. at 463-69.) Johnson's medical records

8

from prison provided additional background.  (Id.)  In summarizing their test findings, the psychologists commented that Johnson "exhibited a lethargic demeanor, anger, a low frustration tolerance and delusional behavior. Mr. Johnson tended to give a blank stare when faced with challenging queries and he did not choose to respond." (Id. at 467.)  They opined that Johnson functions in the "Mild Mentally Retarded Range of intellectual ability," and "will experience great difficulty in functioning in the day-to-day work environment."  (Id. at 468.)  On the Vineland Adaptive Behavior Scale, the psychologists determined that Johnson's communication, daily living, and socialization domains were equivalent to that of a nine-year-old child.  (Id. at 467.)

Following their examination, Hall and Hines completed a mental RFC assessment of Johnson.  (Id. at 476-93.)  They opined that Johnson is markedly limited in nearly all functions of understanding and memory, sustained concentration and persistence, social interaction, and adaption.  (Id. at 476-77.)  They further opined that Johnson meets the Medical Listings for 12.03, Schizophrenic, Paranoid and Other Psychotic Disorders; 12.04 Affective Disorders; and 12.05, Mental Retardation.  (Id. at 480; *see also* 20 C.F.R.§ 404, Subpt. P. App. 1, Listings 12.03. 12.04, and 12.05.)

## B.    Johnson's Testimony

Because Johnson requested that his hearing take place outside the city center because of his fear of tall buildings and crowds (A.R. 105, 246), the ALJ conducted the hearing telephonically with Johnson, his representative, and his mother from the representative's office.  (Id. at 28-29.)  The ALJ had difficulty hearing Johnson due to his mumbling and low

volume, so his representative repeated most of his testimony for the ALJ's benefit.  (Id. at 29-52.)

The ALJ began by asking Johnson to provide his birth date, to which Johnson replied "10, 66."  (Id. at 30.)  Johnson then told the ALJ that he is 66 years old.  (Id. at 31.)  He testified that he lives with his mother, but he also communicated that he does not know who lives in the house with him.  (Id. at 33.)  He claimed that he did not know the names of any of the schools he attended.  (Id.)  When the ALJ reviewed Johnson's brief employment history with him, Johnson claimed that he did not remember working at either McDonald's or Kenny's Ribs.  (Id. at 39-40.)  Johnson testified that he did not know whether he graduated from the eighth grade.  (Id. at 40.)  When the ALJ asked him whether he had ever been in jail, Johnson replied "I, I didn't do nothing. . . .  I don't have no gun. . . .  Please, don't, don't lock me back up."  (Id.)

While Johnson was crying during a portion of the hearing, the ALJ examined Johnson's records from the federal corrections institutions with particular attention to a form (id. at 417) that appeared to be printed and signed by Johnson.  (Id. at 41.)  When asked about that form, Johnson claimed that he could read, and then claimed both that he could and could not read the form.  (Id. at 42.)  He testified that he had signed the form.  (Id. at 43.)

Regarding his activities of daily living, Johnson testified that he spends his days at home and does not go out by himself.  (Id.)  He testified that he has trouble sleeping because "I be [sic] scared" because "[i]t be dark in the house."  (Id. at 46.)  He explained that he took the stairs to his representative's office because the elevator made him feel sick.  (Id. at

43-44.)  He claimed that he does not have hallucinations, but later testified that he hears voices when he sleeps and when he is awake at night.  (Id. at 46-48.)  He testified that the voices tell him "[t]hings are going to happen to me," such as, "I'm going to die."  (Id. at 48.) Johnson said that he does not watch television, does not do any chores, does not need help bathing or dressing, and that he is able to go outside alone, but not on the bus because it is "[t]oo tight."  (Id. at 49-50.)  He mentioned that he does not talk to many people because he is scared that they will do something to him.  (Id. at 48-49.)  He testified that his mother clips his nails and reminds him to take his medication and his sister helps with his laundry.  (Id. at 49-51.)  He further testified that he does not like taking his medicine because it makes him tired.  (Id. at 50-51.)

### C.     Lavern Johnson's Testimony

Lavern Johnson, Johnson's mother, testified that Johnson was incarcerated for about two years in the late 1990's and again from 2003 until 2006, both times on gun charges. (A.R. 53-54.)  According to her testimony, Johnson started special education classes in the third grade and is not literate.  (Id. at 56-57.)  She has never seen him write his name.  (Id.)  Before Johnson was imprisoned, he was able to go to the store by himself, but since returning, he is afraid of people and does not like to go out.  (Id. at 59.)  In her opinion, her son became more troubled after his return from prison in 2006.  (Id. at 58.)  She characterized his problems as having a bad attitude, being angry, staying to himself, and sleeping excessively. (Id.)  He began mental health treatment in 2007, she said.  (Id. at 57-58.)  She knows he has hallucinations because he talks when he is alone in a room.  (Id. at 59-60.)  She took him to the hospital in 2007 because he was having an anger attack and she was concerned for her safety.  (Id. at 60.)  Mrs. Johnson makes sure that her son takes his medicine but she is not convinced that it helps him.  (Id. at 61.)  In summarizing her son's activities of daily living, Mrs. Johnson commented that he sleeps, lies down, paces in the house, and turns on the television.  (Id. at 62.)  He will not do any chores.  (Id. at 62-63.)  He does not have friends and does not leave the house.  (Id. at 63.)  Sometimes he even needs help getting dressed.  (Id. at 63.)

**D.     Medical Expert's Testimony**

Keenan Ferrell, Psy.D., testified at the hearing as a medical expert. (A.R. 67, 135.) He concurred that Johnson suffers from a 12.05 mood disorder,[3] but believed that when medicated, Johnson's ability to function exceeded the limitations of the listing. (Id. at 69.) Citing the treatment records of Beavers and Dr. Jones, he commented that Johnson showed good insight, speech, affect and mood. (Id. at 69, 73.) Dr. Ferrell questioned the accuracy of Johnson's I.Q. scores from 1992, 1999, and 2006, suggesting that scores in the 40s are "inconsistent with other data" in the file because they indicate "a person who would need extreme support or significant support in almost all daily activities and social activities." (Id. at 68.)   In particular, Dr. Ferrell noted that Johnson's signature in his prison medical files was consistent with the penmanship of someone between the fifth and sixth grade levels, and therefore inconsistent with the I.Q. scores. (Id. at 70.) Dr. Ferrell concluded that Johnson's level of mental retardation is "closer to borderline in terms of medication compliance, no more severe than mild." (Id. at 72.) When medicated, Dr. Ferrell believes that Johnson would be capable of "simple repetitive tasks" because he is "no more than moderate[ly limited]" in activities of daily living and social abilities and markedly limited in persistence, concentration, and pace. (Id. at 71.)

---

[3] *See* 20 C.F.R.§ 404, Subpt. P. App. 1, Listing 12.05.

### E. Vocational Expert's Testimony

Before concluding the hearing, the ALJ heard testimony from a vocational expert ("VE"). (A.R. 74-78.) According to the VE, a 31-year old individual with a marginal education and no past work, who is limited to unskilled, routine, simple, repetitive tasks and only occasional contact with the public, coworkers and supervisors, who cannot read or write but has no exertional limitations, could work as a dishwasher, laundry worker, or office cleaner. (Id. at 74-76.) The VE explained though, in response to one of the ALJ's hypothetical, that if the individual had a marked limitation in the ability to sustain attention and concentration, even for simple tasks, and was markedly limited in his ability to travel independently, then there would be no competitive employment available. (Id. at 77.) The VE did not clarify, and was not asked, whether an individual just with a marked limitation in the ability to sustain attention and concentration, even for simple tasks, could find work as a dishwasher, laundry worker, or office cleaner.[4] (Id.)

### F. The ALJ's Decision

On September 30, 2009, the ALJ issued a decision finding that Johnson was not disabled within the meaning of the Social Security Act. (A.R. 16-25.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires him to analyze:

---

[4] On remand, Johnson may seek to obtain clarification on what impact, if any, his marked limitation in persistence, concentration, and pace—a limitation found by Dr. Ferrell—has on his ability to work as a dishwasher, laundry worker, or office cleaner.

(1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform [his] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If at step three of this framework the ALJ finds that the claimant has a severe impairment which does not meet the listings, he must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to his past work or to different available work. *Id.* § 404.1520(f), (g). It is the claimant's burden to prove that he has a severe impairment that prevents him from performing past relevant work. 42 U.S.C. § 423(d)(2)(A); *Clifford*, 227 F.3d at 868.

Though the ALJ found that Johnson suffers from borderline intellectual functioning and depressive mood disorder with psychotic features, he concluded that Johnson is capable of sustaining employment if he follows his medication regimen. (Id. at 18-19.) In reaching that decision, the ALJ rejected the opinion of Johnson's treating psychiatrist and therapist on the ground that they described Johnson in his unmedicated state. (Id. at 19, 23.) The ALJ determined that Johnson, if properly medicated, retained the RFC to perform "unskilled, repetitive, routine, and simple tasks that do not require reading and writing, or more than occasional contact and interaction with the general public, coworkers, and supervisors." (Id. at 20-21.) The ALJ's decision was premised on his assessment of the credibility of Johnson

15

and his mother, which he found to be compromised, his rejection of Johnson's low I.Q. test scores, and his reliance on the opinion of Dr. Ferrell over the opinions of Dr. Jones and Beavers. (Id. at 18-23.) The ALJ concluded that Johnson's claims of disability were not substantiated by the record and he adopted the opinion of the VE that Johnson would be able to work as a dishwasher, laundry worker, and office cleaner despite his non-exertional limitations. (Id. at 23-24.)

## Analysis

Johnson argues that the ALJ's decision should be reversed and remanded because the ALJ failed to acknowledge evidence of his fluctuating symptoms when assessing his RFC, drew unwarranted inferences when assessing his credibility, and improperly rejected the opinions of Johnson's treating psychiatrist and therapist. This court reviews the ALJ's decision to ensure that it is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010), and confines its review to the rationales offered by the ALJ. *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943); *Shauger v. Astrue*, 675 F.3d 690, 695-696 (7th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This standard of review precludes the court from "reweigh[ing] the evidence, resolv[ing] conflicts, decid[ing] questions of credibility, or substitut[ing] [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). But the court must remand the case if the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent

16

meaningful review," *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002), or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (internal quotation omitted).

The court turns first to Johnson's strongest argument—that the ALJ's credibility analysis is flawed because it is based on improper inferences about Johnson's noncompliance with medication. "Normally, we give an ALJ's credibility determinations special deference because the ALJ is in the best position to see and hear the witness." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). But in this case, the ALJ did not see Johnson testify and he struggled to hear Johnson's testimony over the phone. (A.R. 30-51.) Indeed, the ALJ's opinion shows that his credibility determination rested not on his assessment of Johnson's demeanor, but on his evaluation of the record as compared to Johnson's claims. (Id. at 21-22.) When an ALJ's credibility determination "rest[s] on objective factors or fundamental implausibilities rather than subjective considerations such as a claimant's demeanor . . . [reviewing] courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872 (internal quotation omitted).

Here, the ALJ found that Johnson's credibility is "very doubtful" because "there is no indication that [his borderline intellectual functioning and depressive mood disorder with psychotic features] resulted in significant functional limitations that warrant a finding of disability." (A.R. 21.) The ALJ offered numerous reasons for questioning Johnson's credibility and Johnson challenges nearly all of them. First, the ALJ doubted Johnson's

17

truthfulness because he failed to adhere to his psychiatrist's treatment plan. (Id.) The ALJ noted that Dr. Jones's treatment records show that Johnson responded well to medication, seeming to suggest that Johnson's failure to adhere to treatment was inexcusable. (Id.) But the ALJ did not consider that those same treatment notes show that Johnson continued to suffer from hallucinations and paranoid ideations despite medical compliance (id. at 318, 319, 321, 327, 328), nor did the ALJ evaluate whether Johnson's limitations might have caused his inconsistent medical compliance.

Though an inexcusable failure to follow a treatment plan that would improve a claimant's health may suggest that a claimant's symptoms are not as severe as alleged and may also justify a finding of no disability, *see Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992), the ALJ was required by Social Security Rulings to consider explanations for instances where Johnson did not keep up with his treatment regimen before finding that his noncompliance was evidence of incredibility. *See* SSR 96-7p, 1996 WL 374186, at *7 ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."). Johnson argues that his forgetfulness, paranoia, inability to focus on tasks, and his limited mental capacity frustrated his efforts to take his medicine. His testimony provided some support in that Johnson said that he "did not like" his medication because it makes him tired and that he needs reminders to take it. (A.R. 51.)

The ALJ did not investigate these claims even though "one of the most serious problems in the treatment of mental illness [is] the difficulty of keeping patients on their medications." *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010).

The Commissioner argues that the ALJ's reasoning was permissible because the record reveals no good reason for Johnson's noncompliance. For example, Johnson denied any side effects from the medication (A.R. 328, 435), and the cost of his medications was covered by the Chicago Department of Public Health (id. at 316-17). Also, Johnson's treatment notes undercut his claim—Dr. Jones and Beavers indicated that Johnson's ability to follow his medication protocol was good and occasionally fair. (Id. at 329, 330, 333, 334, 511, 513, 514, 516). Though the Commissioner's arguments lend some support to the ALJ's decision, the ALJ himself did not provide them, and they therefore cannot be used to justify the ALJ's decision. *See Steele*, 290 F.3d at 941 ("[P]rinciples of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ.").

Moreover, the Commissioner's citation to *Ehrhart* is not persuasive here. In that case, the Seventh Circuit held that a claimant who was "cooperative, appropriate, oriented, and not affected by delusions or hallucinations," and who offered no excuse for forgoing medication that would improve his condition, could be found not eligible for benefits because of his knowing choice to skip medication. *See Ehrhart*, 969 F.2d at 538-539. But unlike the claimant in *Ehrhart*, Johnson claims that his hallucinations and lack of orientation are the reasons for his failures. In conclusion, the ALJ's belief that Johnson's claims are

19

unbelievable because he did not follow his medication protocol lacks the requisite logical bridge and, thus, cannot be upheld. *See Shauger*, 675 F.3d at 696 ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.").

Johnson makes a similar argument regarding the ALJ's rejection of his I.Q. scores and testimony. According to him, the ALJ did not consider whether his non-responsiveness during testing and at the hearing was a byproduct of his mental disabilities as opposed to evidence of a lack of truthfulness. Johnson points to record evidence that is supportive of his claim, such as the finding by his first I.Q. examiner that the results were valid (A.R. 258); Dr. Long's comment that during the his I.Q. examination, Johnson was "actively hallucinating," was "jumpy and seemed to be very much afraid," (id. at 266); and the observation of psychologists Hall and Hines that Johnson was "disoriented, anxiety ridden" and "out of touch" when they examined him (id. at 465). Similarly, during his testimony, Johnson's statements about his age and confusion about whether the ALJ would put him in jail could be evidence of hallucination or disorientation, consistent with record evidence of hallucinations and difficulty cooperating. (*See id.* at 30-31, 40, 445, 450, 466.) But the ALJ did not consider this possibility, focusing instead on evidence that disputed the accuracy of the initial I.Q. test. The ALJ discussed, for example, Dr. Ferrell's opinion that the I.Q. score was inconsistent with Johnson's activities of daily living, his history of enrollment in regular education classes, his ability to sign his name, his periods of incarceration, his ability to stand

trial, and his GAF scores of 57. (Id. at 21-22.) Johnson argues here that the ALJ's assessment of his activities of daily living are grossly overstated: the ALJ's comments that Johnson is able to "prepare simple meals, drive, cook, clean, shop, and socialize with no apparent difficulties" contradict numerous Activities of Daily Living Questionnaires that state that he cannot cook or spend time socializing without getting angry at people, does no chores, needs help showering and shaving, can rarely leave the home alone, and spends his days pacing, sleeping, and talking to himself or to the voices he hears. (*See* id. at 178-79, 182, 184, 185, 200, 216.) But because these answers were provided by Johnson's mother, whose credibility was rejected by the ALJ and not shored up by Johnson, they are not fully acceptable. Still, there is no record evidence that Johnson is capable of the cooking, cleaning, shopping, and socializing that the ALJ ascribed to him except for Dr. Jones's assessment of Johnson's GAF score of 57, a score that indicates only moderate difficulty in social and occupational functioning. *Diagnostic and Statistical Manual of Mental Disorders,* 34 (4th ed. 2000). But to extrapolate Johnson's activities of daily living from that score would be backwards. Moreover, this court is troubled that the ALJ questioned Johnson's veracity about his fears of tall buildings and elevators because Johnson had taken an elevator to his representative's fourth floor office for his telephonic hearing, when he actually testified that he took the stairs. (Compare A.R. at 22 ("However, despite [Johnson's] claims, the [ALJ] notes that he rode the elevator up to the 4th floor of his representative's office with no apparent problems.") with id. at 44 ("[Johnson] took the stairs.").)

While the Commissioner is right to point out that some record evidence supports the ALJ's rejection of Johnson's credibility, this court cannot "reweigh the evidence," *Clifford*, 227 F.3d at 869, and instead is limited to determining whether the ALJ's decision "fails to mention highly pertinent evidence," *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). In this case, the pertinent evidence that was not considered is that which corroborates Johnson's claim that hallucinations and paranoia may have been to blame for his lack of cooperation during I.Q. testings and at the hearing. In short, because some of the ALJ's reasons for discrediting Johnson are unsupported, and others show that the ALJ may not have considered the impact of Johnson's deficiencies on his ability to stay medicated or cooperate during questioning or I.Q. testing, the adverse credibility ruling cannot stand. This is not to say that this court does not share the ALJ's reservations about Johnson's credibility, or that the ALJ must find Johnson to be credible on remand, but only to say that the ALJ must address whether Johnson's mental illness interfered with his medical compliance and cooperation at the I.Q. tests and at the hearing.

Johnson also challenges the ALJ's assessment of his mental RFC, arguing that the ALJ "cherry-picked" the evidence for examples of Johnson's days of high functioning and ignored the evidence that showed that his symptoms persisted despite treatment. Johnson believes that the RFC analysis failed to recognize his "bad days," meaning the severity and frequency of his episodes of auditory hallucination, psychosis, depression, and paranoia, and whether those episodes occurred despite treatment. To demonstrate this alleged deficiency in the ALJ's analysis, Johnson cites a line of cases addressing bipolar disorder, a disorder

22

described by the Seventh Circuit as episodic in nature and subject to fluctuations despite proper treatment. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). In these cases, the Seventh Circuit has clarified that an ALJ cannot rely solely on the claimant's or doctor's hopeful remarks made during better days, but must consider whether the claimant can hold a job even on low days. *Bauer*, 532 F.3d at 609. The Commissioner argues that the *Bauer* standard applies only to cases of bipolar disorder, a disorder where better days are part of the disease and not evidence of remission, *see Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011), whereas Johnson's fluctuations are due to his medical noncompliance, at least according to Dr. Ferrell, whose opinion the ALJ adopted. Thus, the Commissioner argues that the more appropriate standard to follow here is the standard followed in *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011): an ALJ may not rely simply on "a snapshot of any single moment" as evidence of an "overall condition."

This court need not decide whether to evaluate the ALJ's RFC analysis subject to the *Bauer* standard or the *Punzio* standard because there is a more overarching error in the RFC analysis—the ALJ's discussion failed to comply with SSR 96-8p. That ruling requires the ALJ to consider all the relevant evidence in the case record including "[e]vidence from attempts to work" and evidence of a claimant's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184 at *5, 7. But the ALJ did not discuss how an individual who does no chores, needs help maintaining personal hygiene, and who is prone to anger and lack of cooperation, could

23

function in the workplace. The ALJ's RFC analysis did not contemplate Johnson's history of deserting his jobs or his hostility and lack of cooperation during I.Q. tests, both of which suggest that Johnson's impairments may challenge his ability to work "8 hours a day, for 5 days a week, or an equivalent work schedule." *See id*. at *7. Though the ALJ need not discuss every piece of evidence in the record, he must "confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Here, the ALJ failed to explain how Johnson's limited activities of daily living and medical records show that he is "capable of understanding, remembering and carryout [sic] simple tasks . . . able to interact with others . . . [and] could adjust to routine changes in the work setting," as stated by the ALJ. (*See* A.R. 23.)

Finally, Johnson challenges the ALJ's rejection of Dr. Jones's opinion. Had the ALJ adopted Dr. Jones's opinion, he likely would have concluded that Johnson is disabled because Dr. Jones was of the view that Johnson is extremely limited in his ability to perform activities of daily living and in social functioning and markedly limited in concentration, persistence, and pace, thus meeting the paragraph A and B criteria of Listings 12.03 and 12.04, and the Paragraph A and D criteria of Listing 12.05. (*See* A.R. 309-12; *see also* 20 C.F.R. § 404, Subpt. P. App. 1, Listings 12.03. 12.04, and 12.05.) The Commissioner's rulings require the ALJ to "give 'controlling weight' to a treating source's opinion if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Punzio*, 630 F.3d at 710 (quoting 20 C.F.R. § 404.1527(d)(2)). "An ALJ who does not give controlling weight to the opinion of

the claimant's treating physician must offer 'good reasons' for declining to do so." *Larson*, 615 F.3d at 749 (quoting 20 C.F.R. § 404.1527(d)(2)). In Johnson's case, the ALJ explained that the following medical evidence contradicted Dr. Jones's opinion: Beavers's multiple treatment notes from January 2009 indicate noncompliance with medication, whereas Dr. Jones believed Johnson to be compliant; his medical records from November 2008 show no evidence of mood or thought disturbance; and Dr. Ferrell opined that Johnson's mood disturbance would be less severe, and not meeting Listing 12.05, if he complied with his medications. (A.R. 23.)

Johnson argues that the ALJ's reasoning does not reflect a fulsome view of the record and instead focuses almost entirely on Johnson's poor medical compliance. Johnson claims that the medical record supports Dr. Jones's assessment because it shows that Johnson experienced hallucinations and paranoia even when fully medicated. But as the Commissioner points out, the ALJ cited to Beavers's treatment notes that Johnson was not taking his medication and was exhibiting an appropriate presentation without mood or thought disorders. (Id. at 20.) These records, like Dr. Ferrell's testimony that Johnson would respond to medication, contradict Dr. Jones's opinion of an individual who is markedly or extremely limited in functioning despite medication. The Commissioner argues that Dr. Ferrell's testimony further undercuts Dr. Jones's opinion because it pointed out that Dr. Jones's own treatment notes contradict his formal opinion. While this appears to be true—Dr. Jones's contemporaneous treatment notes indicate that even when Johnson experienced paranoia and hallucinations, his speech, affect, behavior, and memory were

25

within normal limits (id. at 318-319)—the ALJ did not discuss this evidence in his opinion and therefore this court cannot consider it. *See Larson*, 615 F.3d at 749 ("But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here.").

"[I]f the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). In this case, though the ALJ's analysis is somewhat perfunctory, the opinion cites four medical records that contradict Dr. Jones by either showing poor medical compliance or a lack of mood or thought disturbance and Dr. Ferrell's opinion that Johnson would function at a higher level if medicated. Together, these citations provide ample support of the ALJ's conclusion that Dr. Jones's opinion is inconsistent with the medical evidence as a whole and therefore not entitled to controlling weight.

What is lacking from the opinion, however, is any analysis of the appropriate weight to assign to Dr. Jones's opinion. "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2) (additional citations omitted)). Here, many of these considerations suggest that Dr. Jones's assessment is worthy of some weight: Dr. Jones is a psychiatrist (not a psychologist like Dr. Ferrell), he treated Johnson on a bimonthly, then a monthly basis and, at the time Dr. Jones issued his

26

opinion, Johnson had been in his care for eight months. The ALJ did not make any mention of this checklist of factors and appears to have assigned no weight to Dr. Jones's opinion at all. On remand, the ALJ should consider these factors and determine what weight, if any, is merited by Dr. Jones's opinion.

## Conclusion

For the foregoing reasons, Johnson's motion for summary judgment is granted insofar as it seeks a remand for further proceedings.

**ENTER:**


Young B. Kim
**United States Magistrate Judge**